In the Matter of the ADOPTION OF J.P.

C.H., Appellant–Respondent,

v.

E.W., Appellee–Petitioner.

No. 71A03–9901–CV–2.

Court of Appeals of Indiana.

June 30, 1999.

Brian J. May, South Bend, Indiana, Attorney for Appellant.

Charles P. Rice, South Bend, Indiana, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge

C.H., the natural mother of J.P., appeals from the trial court's order granting E.W.'s petition to adopt J.P. As restated, C.H. presents one issue for review: Did E.W. present sufficient evidence to satisfy the requirements of Ind.Code Ann. § 31–19–9–8 (West Supp.1998) allowing adoption without the parents' consent?

We affirm.

J.P. was born to C.H. on December 20, 1994. The putative father did not establish paternity and his parental rights were terminated in June 1997. He is not a party to this appeal.

When J.P. was eight months old, C.H. was arrested on felony charges. J.P. was placed in the custody of the St. Joseph County Department of Welfare, the Division of Family and Children (DFC). C.H. was placed on probation after pleading guilty to a felony. J.P. remained in the custody of DFC.

In July 1996, C.H. requested and received permission from DFC to take J.P. on a visit to Tennessee for about one week. Rather than going to Tennessee for a visit, C.H. moved and did not return J.P. C.H. had begun living with her boyfriend, M.H. DFC next learned of J.P.'s whereabouts when the Madison County Tennessee Department of Children investigated allegations of abuse to J.P. J.P. was taken into custody by the Tennessee Department of Children.

In September 1996, J.P. was returned to Indiana and placed in foster care with the petitioner, E.W. J.P. was twenty-one months old at the time. C.H. was informed that J.P. would remain in DFC's custody. C.H. continued to live in Tennessee. In December 1996, C.H. married M.H.

C.H. did not visit J.P. from the time of J.P.'s return to Indiana in September 1996 until January 1997. Although C.H. continued to live in Tennessee, in January 1997 she commenced visits with J.P. C.H. missed some scheduled visits, but in general she met J.P. one time per month for two to five hours. Most of the meetings were conducted at the office of DFC. C.H. would drive approximately 600 miles from Tennessee to South Bend for the visits.

A report made by the Tennessee authorities, pursuant to an interstate compact between the welfare departments in Indiana and Tennessee, recommended that C.H. not be granted custody of J.P. The conditions in C.H.'s home and M.H.'s violent behavior were the two most significant factors contributing to the Tennessee recommendation.

In April 1998, C.H. moved back to South Bend with her second child, A.H. Because C.H. left M.H. based upon physical and verbal abuse, she lived in a battered women's shelter upon her return. C.H. requested additional visitation with J.P. Based upon the physical abuse of J.P., C.H.'s infrequent visits, the fact that C.H. brought M.H. to some of the visits, and the length of time between J.P.'s removal and C.H.'s return to Indiana, the CASA[1] for J.P. and the CASA case manager recommended that visitation not be increased.

At the hearing on E.W.'s petition to adopt J.P., DFC consented to the adoption. Evidence was entered as to the communication between C.H. and J.P., as well as C.H.'s belief that she did not have to contribute to J.P.'s support while J.P. was in DFC's custody. Evidence was entered also as to the best interest of J.P., including J.P.'s health and circumstances when she lived with C.H. and when she began living with E.W.

The trial court found *inter alia* that the evidence established the requirements to allow adoption without C.H.'s consent, and that the requirements of the adoption statute

---

1. An acronym for court appointed special advocate.

were met.[2] The court granted E.W.'s petition to adopt J.P.

Pursuant to IC § 31–19–9–8, a parent's consent to adopt a child is not required if the potential adoptive parent can demonstrate that certain conditions exist:

(a) Consent to adoption is not required from any of the following:

\* \* \*

(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

\* \* \*

(b) If a parent has made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent.

*Id.*

■ On review, this court will not disturb a trial court's ruling in adoption proceedings unless the evidence would lead to but one conclusion and the trial judge reached the opposite conclusion. *Hudson v. Perry,* 677 N.E.2d 605 (Ind.Ct.App.1997). In *Perry,* the court determined that the evidence that the father was experiencing emotional difficulties, that the child's whereabouts changed often, that a significant distance separated the child and the father for over one year, and that it was inconvenient to contact the custodial parent did not amount to justifiable causes for the father's failure to significantly communicate with the child. *Id.*

■ The subsections regarding significant communication, and regarding failure to support are framed in the disjunctive. Thus, demonstrating either of the two criteria is sufficient to establish that the adoption without parental consent may move forward.

■ Subsection (b) of the statute specifically allows a court to find abandonment despite token communication by the parent. A determination of abandonment justifying obviation of the requirement of consent to an adoption should receive liberal construction so that children who have been denied the benefits of a home and parental care may receive those benefits, but not such an interpretation as would destroy safeguards for the preservation of family relationships. *In re Adoption of Subzda,* 562 N.E.2d 745 (Ind.Ct. App.1990).

---

**2.** IC § 31–19–11–1 provides criteria for entering an adoption decree. The statute requires evidence that "the adoption requested is in the best interest of the child." IC § 31–19–11–1(a)(1). "In an adoption proceeding where parental consent has not been obtained, the court cannot consider whether the adoption is in the child's best interest until one of the statutory grounds for dispensing with parental consent has been proven." *In re Adoption of Augustyniak,* 505 N.E.2d 868, 872 (Ind.Ct.App.1987), *reh'g denied,* 508 N.E.2d 1307, *trans. denied.*

The only subsection of the statute on adoption without consent that refers to best interests of the child is IC § 31–19–9–8(a)(10). It provides that consent of a legal guardian or lawful custodian is not required when the failure to consent to the adoption is "for reasons found by the court not to be in the best interests of the child." Because J.P.'s legal custodian, DFC, consented to the adoption, this subsection is inapplicable to our review.

As noted in the facts, the trial court heard evidence regarding J.P.'s best interest. Some of the evidence is applicable to both the issue of lack of significant contact and to best interest, including: C.H.'s abusive relationship with M.H., C.H.'s living conditions in both Tennessee and Indiana, the abuse of J.P. while she was in Tennessee, and the CASA case manager's testimony that C.H.'s priorities in her relationships place M.H. and A.H. before J.P. The CASA case manager and the CASA tied C.H.'s focus on her husband to the lack of a meaningful relationship with J.P. Even though C.H. was in danger of losing parental rights to J.P., C.H. only made token efforts to maintain contact with J.P. On appeal, C.H. does not develop an argument regarding the best interests of J.P. Accordingly, in the body of the opinion, we will address the question whether the evidence supports a finding that the criteria for granting an adoption without parental consent were met. We note, however, in affirming the judgment of the trial court granting the adoption, that ample evidence supports the trial court's finding that adoption is in the best interest of J.P.

■ C.H. characterized the trips from Tennessee to Indiana with her younger child as a hardship. It is noteworthy that J.P.'s reaction to the visits, as reported by her CASA and the case manager, were not particularly favorable. The CASA and the case manager believed that more frequent visits, or C.H. remaining in Indiana to be near J.P., would have helped establish a better relationship between the two.

C.H. notes that she elicited testimony that J.P.'s reaction to the brief visits could be expected. Yet, the evidence bolsters E.W.'s assertion that the brief visits, with no other form of communication, did not establish significant contact.

E.W. presented evidence that J.P. considered E.W. her mother and considered E.W.'s family as her own. Some of the circumstances suggest that C.H. did not make the effort required to maintain a significant presence in J.P.'s life: J.P. was twenty-one months old when she began living with E.W., and at best, C.H. saw J.P. once per month for two to five hours.

■ The thrust of the statute is to foster and maintain communication between non-custodial parents and their children, not to provide a means for parents to maintain just enough contact to thwart potential adoptive parents's efforts to provide a settled environment to the child. *Rosell v. Dausman*, 175 Ind.App. 618, 373 N.E.2d 185 (1978). The significance of the communication is not measured in terms of units of visits. *Id.* Thus, C.H.'s short, not-quite-monthly visits with J.P., that commenced about four months after J.P. was returned to Indiana, do not establish significant communication. Moreover, that C.H. eventually increased the length of her visits with J.P. after C.H. moved back to Indiana, and just prior to E.W.'s petition for adoption, does not vitiate the lack of significant communication for the one-year period commencing in September 1996 when J.P. was returned to Indiana from Tennessee. *See In re Adoption of Subzda*, 562 N.E.2d at 750 n. 3 (when gauging significant communication, the one-

year period need not immediately precede the filing of the petition).

At the hearing, evidence was presented that the fairly consistent, but brief, monthly visits C.H. made to J.P. were not meaningful. It was clear from the evidence that the case manager and J.P.'s CASA did not believe that C.H. made, or would make, contact with J.P. a priority. Especially noteworthy for them was the minimal effort C.H. made even when she knew that she was in danger of losing parental rights [3] as to J.P.

■ Further, as noted by E.W. in her trial brief, C.H. viewed the time J.P. was removed from C.H.'s home, which included virtually all but the first eighteen months of J.P.'s life, as a holiday from parental responsibilities. C.H. would like to be excused from parental duties, yet retain the rights and benefits of motherhood. *Record* at 43. A parent's careless and negligent failure to perform her parental duties is a significant element when considering abandonment or desertion, regardless of any actual intention or settled purpose by the parent to relinquish parental rights. *Matter of Adoption of Thomas*, 431 N.E.2d 506 (Ind.Ct.App.1982).

Given our standard of review, we cannot say that the trial court erred in determining that E.W. demonstrated that C.H.'s consent to adopt J.P. was not needed pursuant to the terms of IC § 31–19–9–8.

Judgment affirmed.

BAILEY, J., and STATON, J., concur.

---

3. The pending Child in Need of Services (CHINS) and termination of parental rights pro-

ceedings were dismissed in the court order on this proceeding.